Walter REINTS, Reints Sash and Door Company and Hardware Mutual Insurance Company of Minnesota, Petitioners,

v.

Minnie Ella DIEHL, Claimant (In the Matter of the Death of Cecil Boyd Diehl); O. A. Cargill and John Chiaf, her Attorneys; and the State Industrial Commission, Respondents.

No. 37032.

Supreme Court of Oklahoma.

Oct. 9, 1956.

Rehearing Denied Nov. 20, 1956.

John F. Eberle, Richard J. Spooner, Oklahoma City, for petitioners.

Cargill, Cargill & Chiaf, Oklahoma City, Mac Q. Williamson, Atty. Gen., for respondents.

BLACKBIRD, Justice.

Petitioners brought this proceeding to review an award made, under the death benefits provisions of the Workmen's Compensation Act to the respondent, Minnie Ella Diehl, hereafter called claimant, as widow of Cecil Boyd Diehl, deceased, and as guardian of said couple's minor children.

Diehl, a carpenter, died Tuesday, January 15, 1952, while allegedly in the employee of the petitioner, Reints Sash and Door Company, an Oklahoma City partner-

ship, shortly after he had arrived at said company's mill to start his day's work. It occurred after he, while sitting on a box talking to Frank Baylis, another employee, and before commencing work for that day, suddenly collapsed and fell off the box, striking his head on the concrete floor of the mill's carpenter shop. When this incident occurred, Baylis went to the employer's office on the same premises and orally reported it to the shop foreman, a Mr. Holloway. A few minutes later, when Mr. Walter Reints, one of the partners in the employer company, arrived at its office, he was apprised of the incident, and had Diehl taken in an ambulance to Mercy Hospital, where he was seen by a Dr. Davis, an interne at the hospital. From the evidence, it is not clear whether Diehl was then already dead or whether he died shortly afterward. Apparently, on the same day, a local Justice of the Peace, purportedly held an inquest to determine the cause of Diehl's death, and, found that it was due to "Myocardial infarction." Accordingly, this was set forth as the "Disease or Condition Directly Leading to Death," in the Certificate Of Death signed the same day by said justice of the peace.

Thereafter, on April 3, 1952, a "Form 3–A Death Claim" was filed in the State Industrial Commission (hereinafter referred to merely as the "Commission") on behalf of the above-named claimant. In the blank spaces of said form, opposite items 6, 7 and 8, it was represented that the "Date and Place of Death" was "Jan. 15, 1952" at "817 So. Robinson" in Oklahoma City; that the "Cause of Accident" was: "Deceased fell striking head on floor causing death"; and that the "Nature of Injury Causing Death" was: "shock and concussion of brain." Within a few days thereafter, Walter Reints and Hardware Mutual Insurance Company, the employer company's insurer, filed a response denying generally the "allegations" contained in said death claim and denying specifically that Diehl had "suffered injury in the course of his employment * * *", and that his death was the result of such in-

juries. These documents remained on file in the Commission thereafter for more than three years without anything further being done with reference to the matter until May 9, 1955, when claimant filed a second Form 3–A, which she entitled an "amended claim * * *". The only notable differences between this Amended Claim and the original one were in the information set forth in the blank spaces opposite "Cause of Accident" and "Nature of Injury." In both blanks, the words: "Myocardial Infarction" was written, with the addition, opposite "Cause of Accident", of the following: "strain and exertion." Thereafter, on May 13, 1955, the cause came on for hearing before a trial commissioner, who, before the introduction of any evidence, allowed the employer and its insurance carrier to file two pleadings, entitled, respectively, "Objection To Amendment Of Claim For Compensation", and "Motion To Dismiss." In both, it was alleged that claimant had not given the notice required by Tit. 85 O.S.1951 § 24; and, in the objection to the amendment, it was also charged, in substance, that the amended claim showed an accident and injury, as the cause of Diehl's death, different from the accident and injury shown in the original claim; and that therefore the claim was barred by the statute of limitations. The trial commissioner overruled both of these pleadings, stating that claimant could, at the conclusion of the evidence, amend her claim to conform to the proof, and if this necessitated additional time to defend, that also, would be afforded. Our subsequent collective reference to the defending employer company and its insurance carrier will be by the designation of "Respondents", as they appeared in the hearing before the Commission.

As was forecast by the above-described amendment of her claim, claimant's evidence was contemplated to prove that instead of being caused from falling off the box and striking his head on the floor, Diehl's death on Tuesday, January 15, 1952, was the result of a heart attack caused by strain and overexertion, entailed in un-loading and stacking a truck load of lumber for the employer on the previous Friday, January 11.

At the close of the hearing, the trial commissioner entered an order in claimant's favor and fixing the manner in which the award of $13,500 should be apportioned, after specifically finding that Diehl "sustained an accidental personal injury, arising out of and in the course of his hazardous employment * * * on January 11, 1952, as a result of which he died on January 15, 1952, such injury being a heart strain, causing myocardial infarction." Said order and award was sustained on appeal to the Commission en banc.

■ In the present proceeding for review, respondents argue their assignments of error under ten "Propositions". Of these, the 4th, 5th, 7th, 8th and 9th pertain to the claimed insufficiency of the evidence to support the award and the Commission's findings. We will supplement our previous statement herein with further statements of such additional facts as are necessary to understand each of respondents' arguments, as they are dealt with.

The only direct evidence to support the claim that Diehl ever unloaded any lumber for the respondents, Walter Reints and/or Reints Sash and Door Company, and, of the objective origin of his injury while doing so, is found in the testimony of the witness, J. E. Russell, claimant's 61-year old brother-in-law, who has been both a grocer and a carpenter. This witness testified that "somewheres about" Friday, January 11, 1952, he went "down there to where he (Diehl) was working * * * by the railroad, on the north side of the railroad * * *" to get a circular saw Diehl had, that the witness "wanted to get hold of." As to the work Diehl was doing when he arrived there, this witness testified that Diehl was assisting two other men in unloading a ton and a half, or two ton, flat bed, truck "between the warehouse and the shop, seems like just west of the shop." His further testimony was to the effect that one of the men was

up next to the cab of the truck sliding the lumber back on its bed "to where he (Diehl) could get a hold of it · * * *"; and Diehl was pulling it off the truck bed and "setting it up on a stack to be stacked." When asked what was the size of the boards Diehl was handling, the witness said they were "something like" 16, 18 or 20 foot "two by 12'S", containing "32 or 40, 36 or 40 feet" (presumably square feet). His estimate of the boards' weight was 3½ pounds per foot and he stated that there "was something around 1500 feet" on the truck. Russell further testified that he stayed until the lumber was all unloaded, and that Diehl "looked white in the face"; and the witness remarked to him that he looked like he was sick.

The claimant testified that, when Diehl came home from work that day, he "looked worn out" and pale, and, from his facial expression looked like he was suffering pain; that he went to bed without eating any supper; that he vomited and sweat "quite a bit", and he took some Tums and she rubbed his body with alcohol. She further related that on Sunday (which was the second day thereafter) Diehl went to bed and got "pale as he could be * * *"; and that she had never seen him look that way before. However, according to the undisputed evidence, Diehl worked four and a half hours that Satur-. day (the next day following the day of the alleged overexertion from unloading lumber) and he performed his normal work on the following Monday, before his collapse, Tuesday morning, although, according to claimant, "he didn't feel good."

One of respondents' contentions is that the evidence was deficient in establishing that Diehl was working for either of the respondents, Walter Reints, or Reints Sash and Door Company, at the time he suffered the claimed injury. This argument is based almost entirely upon the assertion that the witness, J. E. Russell, never sufficiently identified the place at which, or employer for whom, Diehl was working when he was supposed to have overexerted himself unloading the aforesaid lumber truck. Re-

spondents' counsel make much of the fact that although the record shows that the address of the Reints Sash and Door Company is 817 South Robinson, Russell, in answer to a question at one place in his testimony, gave the address of the place where he saw Diehl unloading the lumber as: "700 South Robinson." On the basis of this answer counsel argue that, as far as the evidence shows, Diehl was working for some unidentified employer, a block and a half from the Reints Sash and Door Company, at the time of his claimed injury. This argument ignores other portions of this witness' testimony and other evidence in the record. From Russell's estimation of said company's address on South Robinson, and his further testimony that it was "on the north side of the railroad", it could reasonably be inferred that the location he referred to was between the railroad and Southwest Seventh Street, and fronting on South Robinson Street. Upon consideration of this testimony, with the testimony of the respondents' witnesses, J. W. Drabeck and Frank Baylis, showing that (although its address of "817" would, in the address system used in most cities, place it between Eighth and Ninth Streets) the Sash and Door Company's location adjoins that of the Drabeck Tractor Service, whose street address is 208 Southwest Seventh, and its warehouse is north and west of its "main building" and "sits right on the railroad track", we are convinced that these witnesses were all testifying about the same address or location; and that Russell, being either forgetful, or unfamiliar with Oklahoma City's system of addressing, just assumed that because the Sash and Door Company was situated so near the corner of Southwest Seventh and South Robinson Streets, its number on South Robinson was "700". The claimant's answer to her counsel's query as to the location of Reints Sash and Door Company would indicate that even she was not certain whether it was near "Eighth or Seventh on * * * South Robinson", but we have little doubt, considering the length of the period during which her husband had worked there for

said company, that had the occasion arisen for doing so, this witness could have found her way directly to the Sash and Door Company without directions from anyone. Furthermore, all of the witnesses, who were interrogated about it, including the respondents' witness, Mr. C. E. ("Gene") Heyser, a partner and Reints' Sales Division employee (who testified in some detail about the payroll records) agreed that, at the time of his death, Diehl had been continuously employed by said company, (on apparently a full-time basis) for more than two months (though before November 2, 1951, his last previous period of employment had ended about August, 1950); and the uncontradicted evidence disclosed Diehl worked for the company fulltime, both morning and afternoon, of the day Russell testified he saw him unload the lumber. We think the evidence as a whole sufficiently established that Diehl was then and there employed by the respondent, Reints. Sash and Door Company.

Respondents also contend that the evidence was insufficient to show that Diehl's claimed injury was incurred during the course of his employment. To show that helping unload lumber was not within the scope of his employment, they elicited the testimony of Mr. Heyser, the warehouse. foreman, A. B. Holloway, and Diehl's fellow-employee, Frank Baylis. Without lengthening this opinion to describe such testimony in detail, we think it conclusively shows only that Diehl was employed and paid, as a carpenter, or a skilled, rather than an unskilled, laborer; and that unloading lumber was not one of his principal or usual tasks. No witness, considering his testimony as a whole, ever directly or unequivocally contradicted or negated the reasonable inferences to be drawn from claimant's evidence and the evidence as a whole, that in unloading the lumber in question, under the circumstances here involved, Diehl was acting within the scope of his employment, though he did not frequently or usually do such work. No conclusion can be reasonably drawn from the testimony of the aforementioned witnesses of respondents,

but that Diehl had a variety of tasks in and around the Reints mill and warehouse and was subject to changes in his assignments as the need arose. Though, on direct examination, the warehouse foreman, Holloway, testified that he never had Diehl unload any *box car,* and that "most of the time when we would get in a box car, we would get employees (unskilled laborers at 80 cents an hour, rather than at $1.30, the hourly wage paid Diehl) at the employment office, to do that type of work, * * *. Because he (Diehl) was paid to do carpenter work;" neither he, nor any other witness for respondents, ruled out the possibility that on the particular day in question, January 11th, Diehl was unloading lumber from a truck just as claimant's witness, Russell, had testified. Typical of much of these witnesses' testimony on the subject, is the following excerpt from Holloway's testimony on interrogation by respondents' counsel:

"Q. (* * *) All right, on January 11, 1952, which was Friday, did he (Diehl) unload any (lumber) that day to your knowledge? A. *Not* that *I know of."* (Emphasis ours.)

It would appear that if any of the respondents' witnesses referred to knew positively that Diehl did not unload lumber from a truck on the day in question, or that his employer had had extra help for that purpose on that particular day, or for any other reason, Russell's testimony could not have been true or correct, this would have been brought out by respondents' able counsel. After a thorough examination of the evidence, we are not prepared to say that the Commission's finding that Diehl's injury arose "out of and in the course of his * * * employment" was without competent evidence reasonably tending to support it.

Respondents further contend that, as far as the evidence shows, there was no causal connection between Diehl's claimed injury from overexertion in unloading lumber on January 11, and his death four days later, on January 15. In this connection, we observe that under their Proposition No. 6,

in which they allege error of the trial Commissioner in admitting in evidence Diehl's death certificate, and certain answers given by some of the physicians to hypothetical questions, they mention the fact that: "In the case at bar there is no death report of any physician who examined the decedent." As hereinbefore indicated, the record does not unequivocally disclose whether Diehl breathed his last before, or after, he arrived at Mercy Hospital. As aforementioned, it does show that an interne at said hospital, referred to as "Dr. Davis", examined him on his arrival there, but we do not know whether Diehl was then alive or dead. While it is true that the record contains no direct evidence from Dr. Davis, or any other medical witness who ever saw or examined Diehl or his body, and, in his testimony, the claimant's witness, Dr. T., recognized the value of laboratory tests as aids in diagnosing heart ailments, respondents cite no authority, and we know of none, requiring, for proof of death due to a heart condition, either the testimony of, or a report from, a physician who examined and/or treated the deceased during his lifetime, or a report of an autopsy thereafter performed.

■■■ The evidence further discloses that it was not until the Justice of the Peace consulted with said interne, and his fellow-investigator, an Oklahoma City Chief of Detectives, at an inquiry referred to as an "inquest" (at which no witnesses were sworn) that he filled out the death certificate showing "myocardiac infarction" as the "Disease or Condition Directly Leading to Death." Respondents' argument that the award should be vacated on the theory that the photostatic picture of his death certificate was inadmissible for the purpose of showing the cause of Diehl's death, as well as their argument that, for this reason, the testimony of certain of the physicians as to such cause, was also inadmissible, because partly based thereon, are both without merit. The record shows, in the words of the trial Commissioner, that the death certificate was admitted "not necessarily for the purpose of showing the

cause of death, but to establish other information of the death." The record furnishes some basis for counsel's representation that Dr. T.'s opinion that Diehl's death was due to myocardiac infarction was based, at least partly, on the inclusion of that term in the death certificate; but the commission's finding that said death was due to that kind of an attack does not rest solely on that doctor's testimony. Even the testimony of respondents' physician witness, Dr. H. A. D., was to the effect that Diehl died of a heart attack. Dr. T.'s opinion that such was the cause of Diehl's death may therefore be considered cumulative and unnecessary surplusage. There are no better established rules of appellate review than those which declare that parties cannot successfully complain of their adversaries' introduction of evidence to the same effect as the evidence they have themselves introduced, and that render harmless the introduction of such evidence. See City of Muskogee v. Magee, 177 Okl. 39, 57 P.2d 252; Parish v. Ned, Okl., 264 P.2d 762, and other cases digested in 2A Okla.Dig., Appeal & Error, ☞1051(1).

■■■ Respondents also complain, under their Proposition No. 6, of being "denied the privilege of making inquiry based upon the facts in evidence as to whether or not the decedent died of a stroke." They say their Dr. H. A. D., testified that "where a person drops dead, the cause of death may be either heart attack or stroke." While this representation of one part of said Doctor's testimony is substantially correct, it does not tell the whole truth about it. His testimony, as a whole, strongly indicates his opinion that Diehl died from a heart attack; and we think the trial commissioner was correct in sustaining claimant's counsel's objection to further interrogation concerning "stroke". As claimant's counsel pointed out, that was the first and only time any witness ever mentioned the possibility of Diehl's having died of a stroke; and this witness' speculation about it, or discussion of the characteristics of that kind of an attack, would have been purely academic and abstract from the standpoint

of the issues in this case. Furthermore, respondents' counsel's statement (upon the Commission's ruling excluding further interrogation) that "if permitted to develop this line of testimony we would show that this deceased—that the evidence points to a stroke, as well as any other cause of death" does not relieve this alleged error from operation of the rule requiring a proper offer of proof in such situations. See Hudson v. Blanchard, Okl., 294 P.2d 554, and Boone v. State, Okl., 261 P.2d 581. The principal difference, if there can be said to be any material one, between claimant's medical testimony and that of Dr. H. A. D., was in the conflicting opinions therein expressed as to whether Diehl's death from a heart attack, or myocardiac infarction, on January 15th, could have been caused by overexertion on January 11th. All of the physicians agreed that some arterio·sclerosis, or hardening of the arteries, was a necessary prerequisite to an attack like Diehl had. Dr. H. A. D. characterized this prerequisite as "heart disease." We think it clear upon comparison of their testimony that they all were talking about substantially the same thing. The way in which unusual exertions may cause death from myocardiac infarction was explained by Dr. T. as follows:

"A. Well, first of all we know a number of facts: that exertion, as such, will not cause coronary occlusion with infarction, unless there is a preceding coronary, arterio sclerosis, or hardening of the arteries. We know also that exertion, whether it be occupation or non-occupational, is a causating factor in producing coronary occlusion with infarction, and particularly so in time relationship. In other words, if there are symptoms of coronary artery disease, or cardiac disease, which appears *within one or two hours, and at the most within twelve hours,* then we consider that there is a definite causating relationship. I feel like that, in my opinion that the myocardial infarction as such may not be apparent at that time, *may not actually develop as the death of a muscle until perhaps a few days or a few weeks later on.*

"Q. Do I understand myocardial, is that heart muscle? A. Yes. * * * the myocardial is the heart muscle.

"Q. What does this exertion do to that muscle? A. Actually we know that most individuals, anyone sitting in this room, have what we call coronary arteriosclerosis; * . * * we find that as the result of sudden strain, there is usually a little hemorrhage that occurs in the wall of the blood vessel, which then cuts off the supply of blood to that area of the heart. Then, as a result of the stopping of the blood flow to that part of the heart, depending upon how long the process takes, and so forth, undergoes death of the heart muscle, necrosis." (Emphasis ours.)

Dr. S. D., testified in part:

" * * * The symptoms come on either early or late. * * * The physical effort will affect the coronary arteries to cause, to have a thrombosis; and when the thrombosis is formed in the coronary, it also affects the heart and causes a myocardiac infarction."

We think the trial commissioner was warranted in concluding that the effects of Diehl's exertion in unloading the lumber carried over to, and continued to exist on, the following Monday and Tuesday morning until his death; and that same was the cause of his death, despite the fact he worked all day Monday, without (according to respondents' witnesses) any complaint as to his physical well-being except that he seemed to have gas on his stomach as related by respondents' witness, Frank Baylis. The cases cited by respondents' counsel go only to the proposition of the necessity of evidence from skilled medical experts to prove cause and extent of disability. As herein indicated there was an abundance of such testimony in this case; and, while they never specifically named the symptoms which precede myocardiac infarction, it is unmistakable from their testimony, that more than one of the physician

witnesses thought the symptoms related by the lay witnesses made it practically certain that Diehl's exertion from unloading the lumber, caused, or brought on, the above-described condition in his body. Respondents utterly failed in their attempt to show that Diehl so exerted himself by starting his motorcycle before arriving in Reints Mill on the morning of his death, or that he had done something else to bring about that condition.

Under their Proposition No. 4, respondents' counsel cite cases to the effect that an injury, to be compensable, must have some "objective origin", and that a compensable disability must arise out of accidental injury. In this connection, notice the discussion in Chalfant v. Arens, 167 Or. 649, 120 P.2d 219. They attempt to distinguish the cases claimant's counsel cite by the difference in the tasks the involved employees were performing at the time of their heart attacks. Then, they reiterate the assertion already disposed of herein, that at the time of his attack Diehl "was not engaged in any work he was paid to do." They also point to the fact that he had not commenced his day's work at the time of his collapse on the morning of January 15th. There is no merit in this argument. The evidence is sufficient to support the award upon consideration of the matters referred to in Gulf Oil Corp. v. Rouse, 202 Okl. 395, 214 P.2d 251, and similar cases.

Respondents' Proposition No. 10 pertains to the Order of the Commission en banc affirming, on appeal, the award previously made by the trial commissioner, as hereinbefore related. Said order discloses that the trial commissioner voted for the affirmance, along with four other members of the Commission. Respondents say that the trial commissioner was prejudiced against them, that it was error for him to participate in said decision on appeal, and that this prevented them from having a fair and impartial trial. We find no merit in this argument, in view of the fact that the other four of the five commissioners comprising the commission en banc, voted "Aye" in favor of affirmance, and respondents fail to demonstrate that the appeal would have had a different result had the trial commissioner disqualified, or abstained from voting.

Under their Proposition No. 3, respondents contend that the trial commissioner should have sustained their "Motion To Dismiss" at least as early as the evidence disclosed that the injury relied on by claimant for recovery, was "myocardiac infarction" due to "strain and exertion", which occurred in or near Reints' warehouse on January 11, rather than upon the first claimed injury ("shock and concussion of brain" from striking his head on the floor), which allegedly occurred at the later date of January 15, inside the Reints' mill. They argue that the filing of the original Form 3-A claiming compensable injury and/or death from a head injury did not toll the running of the one-year period of limitation prescribed in 85 O.S.1951 § 43, so as to relieve the proceeding from this statutory bar, because it was prosecuted or maintained on the basis of an amended Form 3-A, which alleged an entirely different injury that occurred at a different place and on a different date. They seek to invoke the general rule pertaining to pleadings in ordinary court actions to the effect that "an amendment which introduces a new or different cause of action * * * does not relate back to the beginning of the action, so as to stop the running" of the limitation period, citing Fowler v. City of Seminole, 202 Okl. 635, 217 P.2d 513. In this connection notice also the discussion in Motsenbocker v. Shawnee Gas & Elec. Co., 49 Okl. 304, 152 P. 82, L.R.A.1916B, 910. We do not agree that this rule should apply to procedings under the Workmen's Compensation Act the same as to ordinary court actions. This court is one of those subscribing to the doctrine that statutes of limitations with reference to the filing of claims under said Act are directory, rather than jurisdictional. See Skelly Oil Co. v. Harrell, 192 Okl. 101, 134 P.2d 136, 138, and Pine v. State Ind.

Comm., 148 Okl. 200, 298 P. 276, 78 A.L.R. 1287. And, like the courts of most jurisdictions having workmen's compensation acts similar to ours, this court has never applied to such claims, the strict rules of pleading applicable to court actions. In Glasgow v. State Ind. Comm., 120 Okl. 37, 250 P. 138, we held:

"It is not intended that the strict rules of pleading and practice required in courts of record should be applied to the pleadings and practice of the Industrial Commission, but pleading and procedure under the Act was intended to be sufficiently flexible and practical that men of good judgment and reasonable intelligence could apply them to accomplish the purpose intended without regard to technicalities."

In this connection, see also Johnson v. El Dorado Creosoting Co., La.App., 71 So.2d 613; Taslich v. Industrial Comm., 71 Utah 33, 262 P. 281 (Syl. 6); Consolidated Coal Co. v. Dill, 248 Ala. 5, 26 So.2d 88, (where the amended complaint alleged that the accident and injury occurred: "on, towit Sep. & October, 1949"); Littell v. Lagomarcino Grupe Co., 235 Iowa 523, 17 N.W.2d 120; Laperouse v. McWilliams Dredging Co., La.App., 35 So.2d 481; Brooks v. Smith, La.App., 35 So.2d 613. And, in Amerada Petroleum Corp. v. White, 179 Okl. 82, 64 P.2d 660, 661, we held:

"The jurisdiction of the State Industrial Commission to make an award is not dependent upon the form or substance of the application therefor. The Commission has plenary power to make its award conform to the facts and the applicable provision of law."

And, in Higginbotham v. Oklahoma Portland Cement Co., 155 Okl. 264, 9 P.2d 15, this court held that an injured employee's letter was a sufficient claim. See also Mercer v. Ott, 78 W.Va. 629, 89 S.E. 952, and Lumberman's Mutual Casualty Co. v. Layfield, 61 Ga.App. 1, 5 S.E.2d 610, in which a letter from an injured employee that omitted the date of his claimed injury was held sufficient to interrupt the running of

the statutory limitation period. And, in Earl W. Baker & Co. v. Maples, 155 Okl. 105, 8 P.2d 46, this court held: "Exact precision is not required in describing the nature and extent of accidental injury in a claim of an injured employee filed with the State Industrial Commission"; and further said: "The claimant may be entirely mistaken as to the nature and extent of the injury. Such matters are to be determined by the evidence presented before the Commission." In Shell Pipe Line Co. v. Camper, 143 Okl. 94, 287 P. 1009, 1010, the claim for compensation alleged that the accident causing claimant's injury occurred "in the middle of June, 1928", whereas it was indisputably established at the hearing that it occurred May 22nd. This court held such variance was not reversible error. In this connection see also Horton v. Industrial Comm., 88 Utah 306, 54 P.2d 249, 250, in which the court, among other things, said:

"It is the established law in this jurisdiction that an application for compensation is sufficient to vest the commission with jurisdiction to grant an award even though it may not measure up to the requirements of a complaint in an action at law. (Citing cases.) * * * As a general rule, the particular date when a cause of action arises is immaterial; that is to say, in both actions at law and suits in equity the pleader, is not required to prove that the matter complained of occurred on the particular date pleaded. The mere fact that the application indicated that plaintiff fell over a box while carrying the meat on February 2d, instead of January 23d, cannot be said to defeat his right to be heard on his claim that he was injured on January 23d by falling over a box. Nor is there any legal objection to an applicant relying on two separate accidental injuries as the basis of his claim for compensation, especially where, as here, *there is some doubt as to which of the two injuries caused the disability for which compensation is sought.* (Emphasis ours.) * * *."

·Furthermore, an employer's notice of injury showing that an employee has sustained a compensable injury, renders it unnecessary in order to toll the limitation period, for the employee himself to file any claim whatsoever. ·See Oklahoma Natural Gas Corp. v. Craig, 193 Okl. 56, 139 P.2d 181, 141 P.2d 99. In the following cases involving collectively questions of notice, amendment, and limitations, courts of other states have indicated their view, upon consideration of workmen's compensation laws' death benefit provisions not entirely different from ours, that the cause of action of the deceased employee's dependents arises from his death, rather than from his injury. See Judd v. Rinelli, 75 Idaho 121, 268 P.2d 671; Wilkinson v. United Parcel Service, 158 Pa.Super. 22, 43 A.2d 408; Burke v. Industrial Comm., 368 Ill. 554, 15 N.E.2d 305, 119 A.L.R. 1152, and Esposito v. Marlin-Rockwell Corp., 96 Conn. 414, 114 A. 92. In this view, it would seem that if an amended claim does not make a material change in the information set forth in the original claim with reference to the (date and place of) employee's death, but merely gives different information about the *injury causing* his death, it does not allege a new cause of action and therefore, under the doctrine of "relation back", supra, it would not be barred by lapse of more than the limitation period, between its filing and the filing of the original claim. However, in both the Wilkinson case, supra, where many of the facts closely paralleled the present one, and in Pardeick v. Iron City Engineering Co., 220 Mich. 653, 190 N.W. 719, the fact that the employer had knowledge or notice of the injury seems to have been an important, if not controlling, factor.

This brings us to respondents' argument under their first and second Propositions that the claim and amended claim were barred by reason of claimant's failure to give the 30-day notice required by Tit. 85 O.S.1951 § 24; and that it was error for the Commission to make an award without first either excusing or refusing to excuse, such failure. We think this argument has merit. Although respondents recognize that, on the basis of the undisputed evidence, Reints Sash and Door Company had actual knowledge of Diehl's collapse and death on January 15th, they say such knowledge did not constitute notice to it of his claimed injury from unloading lumber at their warehouse four days earlier. We think this is correct, unless the Sash and Door Company was apprised, from the investigation conducted within a short time after Diehl's death, or in some other way, that he had suffered the earlier injury. Although there are fragmentary references to such investigation therein, the record as it now stands, does not purport to show all of the information obtained in said investigation or to disclose all of the things of which either of the respondents was thereby apprised. Claimant's counsel advocate application to this case of the rule that where the record shows actual notice to the employer, failure of the Commission to make a finding excusing the giving of written notice is harmless error, citing Producers Pipe & Supply Co. v. Clevenger, 198 Okl. 601, 180 P.2d 667, and Nuway Laundry Co. v. Trice, 182 Okl. 518, 78 P.2d 706. Here, however, as far as the record shows, neither Reints Sash and Door Company, nor any of its employees, except of course Diehl, knew that he was unloading lumber on January 11th, and that he suffered any injury therefrom. Under the circumstances of this case, the fact that Diehl collapsed and died before commencing work on January 15th, certainly could not, in itself, constitute notice to his employer that he had suffered an injury at a different place four days earlier. Here, there was both a denial by the employer that it had actual notice of such an injury, and a total absence of any direct evidence, or specific finding, that it had such notice, or that claimant's failure to give such notice was, under the circumstances, excused. In this connection see Protho v. Nette, 173 Okl. 114, 46 P.2d 942. Of course, respondents made no effort to establish that they, or either of them, was prejudiced by any lack

of such notice, but, under the circumstances, they were not called upon to do so.

Under the foregoing decisions, the Commission erred in failing to make a finding pertaining to the employer's prejudice, or lack of it, from claimant's failure to give notice of the injury within the 30-day notice period. As to the application of the 1-year limitation period to claimant's amended claim, it does not come with good grace for an employer to endeavor to escape liability because he had not been served with formal notice of the occurrence of the injury, if he had actual notice of it, either at the time of its occurrence, or at such time within the 30-day notice period as would have afforded him an opportunity for a proper investigation thereof. As to this and other matters, see Wilkinson v. United Parcel Service, supra. In keeping with the liberal views this court and others have adopted on questions of pleading, practice, procedure and statutory construction as related to proceedings under the Workmen's Compensation Act (in order to maintain the rights of injured employees and to fulfill the purposes of said Act), we think its provisions with reference to notice, and to limitation on the filing of claims, should not be construed to bar proceedings for death benefits, where claims therefor have been seasonably filed, and the employers, before expiration of the 30-day notice period, or within time to ascertain the necessary facts, have knowledge or information which would lead a reasonably prudent person to believe that the deceased employee's death was caused by a compensable injury.

On the basis of the foregoing considerations, although we have concluded and now hold that the Commission's finding and order, to the extent of its determination that Diehl's death was compensable, should not be vacated as lacking in evidentiary support, we also hold that said Commission erred in failing to make a finding as to whether or not Reints Sash and Door Company, or its insurance carrier, had actual knowledge or notice of the injury Diehl was shown to have suffered January 11th, 1952, while unloading lumber. For such finding, additional evidence must be adduced. If such evidence should show that said employer had no such notice or knowledge, and was thereby prejudiced, the claim is barred. If such evidence shows said respondents had actual notice or knowledge of said injury, or for any other reason authorized by sec. 24, supra, the giving of the 30-day notice prescribed by said section, should be excused and the Commission so finds, then claimant is entitled to the award.

Accordingly, we vacate the award and remand the case to the State Industrial Commission for further evidence on the question of notice and a proper determination and finding thereon, together with any other findings and/or conclusions necessary or appropriate to such determination, and as may be warranted by such additional evidence.

JOHNSON, C. J., and WELCH, CORN, DAVISON and CARLILE, JJ., concur.

WILLIAMS, V. C. J., and HALLEY and JACKSON, JJ., dissent.