RHOADES OIL COMPANY and Mid-Continent Casualty Company, Petitioners,

v.

William Neal PLUMB and the State Industrial Court, Respondents.

No. 42122.

Supreme Court of Oklahoma.

July 10, 1967.

Watts, Looney, Nichols & Johnson, Oklahoma City, for petitioners.

Buck Cartwright, Wewoka, for respondent William Neal Plumb.

BLACKBIRD, Justice.

By the order of the State Industrial Court herein reviewed, the respondent, William Neal Plumb, hereinafter referred to as "claimant" was awarded the compensation prescribed by the Workmen's Compensation Law for a permanent disability, found to be due to an accidental injury to his heart.

In the claim instituting the proceedings in that court, it was represented that claimant's heart condition was due to "strain and exertion while cranking light plant unit on lease."

In support of his claim, the claimant testified in that court that on March 3, 1966, he was working as a roustabout for the respondent, Rhoades Oil Company, hereinafter referred to as "petitioner", on a certain oil lease; that a part of his duties, before leaving the job each day during the winter time, was to start an engine that powered a light plant there, so that it would "be running for the night man when he comes on"; that he was "at the light plant about 4:30 in the evening"; that he "didn't get it started" on natural gas, the "way we usually did it", so he then primed the engine with gasoline and commenced cranking it manually; that while doing this cranking "sharp pains" hit him in the chest, and he was "just about knocked out"; that he "went down and * * * just laid there a while"; that he "laid there * * * and stayed close for nearly an hour"; that he then "got over to * * * (his) pickup and finally got up in it * * *", and drove said truck towards his home; that when he arrived there, he started getting out of the truck, when his wife drove up in their drive-

way and "could see something was wrong"; that she assisted him into the house; that he started vomiting and he told her he had to get some help; that they didn't have a telephone, but, about that time, their landlord drove up and assisted his wife in getting him into the car in which he was taken to Holdenville's Physicians and Surgeons Hospital, where he saw a Dr. C; that this doctor examined him and tried to get him to stay in the hospital that night, but he insisted on going back home; that he got to "cutting off" again, and returned to the hospital the next morning and remained there until March 22nd, and is still under Dr. C's care; that he has been taking medicine prescribed by this doctor; that he still sees him "about every two weeks"; that the doctor "checks my blood and about every other time he runs a cardiogram"; that he has not worked since the attack; that his attorney had him examined by Dr. P and Dr. B, and his employer had him examined by Dr. Mc—all of Oklahoma City.

The reports of the first two, of these three, doctors were introduced as claimant's Exhibits numbered "1" and "2", and the report of the last one was introduced as "Respondent's Exhibit No. 1"; but no testimony, nor report, from Dr. C was introduced. According to the exhibits, Dr. P's examination was made on April 25th, Dr. B's was made on June 10th, and Dr. Mc's was made June 14th—all in 1966.

The first part of the separate reports of both Dr. P and Dr. B appears to relate to what claimant told them of circumstances surrounding his attack, of his medical history, and of his treatment by Holdenville's Dr. C, from that time until he reported to them for examination. Both Dr. P and Dr. B expressed their opinions in their reports that claimant suffered a permanent injury to his heart, which they diagnosed as "an acute myocardial infarction", rendering him permanently and totally disabled for the performance of ordinary manual labor.

Among other things unnecessary to mention, Dr. P's report stated: "In this case, the important, immediate precipitating and causative factor was extensive exertion and extensive demand on the heart muscle by the work he was doing (cranking the plant motor)." That Dr. P's diagnosis was based, at least partially, on the claimant's medical attention in Holdenville, is inferred by his report's first mention of "acute myocardial infarction" being followed by "as evidenced by his findings on admission to the hospital, particularly his ECG findings and findings on the enzyme studies." This is made clear by the following portion of the report:

"My opinion is based upon the following:

"1.  History obtained from the patient.

"2.  Physical findings, X-rays and laboratory findings.

"3.  Review of hospital records from the Holdenville Hospital.

"4.  A consideration of known and accepted medical facts concerning the etiology and pathogenesis of myocardial infarction as applicable to the case under consideration."

Dr. B's report on his examination reads, in pertinent part:

"* * * Electrocardiogram was done which shows the effect of a posterior myocardial infarction and frequent ventricular premature beats."

Pertinent parts of Dr. Mc's report are as follows:

"Physical examination revealed a well developed, well nourished white male in no acute distress. He has a blood pressure of 140/88, pulse was 86 with normal venus rhythm, but frequent ventricular premature contractions. * * *; examination of the heart showed no cardiac enlargement, no PMI is present. Left border of cardiac dullness is 4 cm lateral to midsternal line in the fifth intercostal space.

*     *     *     *     *     *

"An electrocardiogram shows a T wave that is low in lead 2, inverted in lead 3, and inverted in AVF. There are frequent ventricular premature contractions. No definite infarction is noted but the

inversion of 3 and AVF waves is suggestive of posterier mycardial infarction.

"My impression is that Mr. Plumb has chronic anxiety reaction, gas on bowel with pain due to this. *His electrocardiogram is not diagnostic, but is suggestive of a healed myocardial infarction.* Fluoroscopically there is no cardiac enlargment. From the examination and from the electrocardiogram there is no evidence of myocarial infarction. *I would insist on the electrocardiograms made during the tim*e *the patient was in the hospital as well as enzymes such as SGOT to confirm this diagnosis.*

"It is my opinion that the patient is now healed and that he should gradually increase his activities and return to work. It is also my opinion that *since the patient was doing his normal daily chores* for the Rhoades Oil Company that *there is no evidence that this attack was related in any way to his work.* He would be approximately 15% disabled to the total body if the myocardial infarction is confirmed on further studies." (Emphasis added).

On the basis of the above evidence supplemented, in no significant degree, by the testimony of other lay witnesses, the Industrial Court specifically found, in its order granting claimant the award, that his heart injury arose "out of and in the course of his hazardous employment * * *".

In urging vacation of the award, petitioners emphasize the absence of any evidence in the record from claimant's attending physician, Dr. C, who, as hereinbefore shown, is still treating him. It seems to be their position that without such evidence, the reports of Drs. P and B were incompetent as medical evidence, being based, at least with reference to the cause of claimant's myocardial infarction, upon hearsay related to those Doctors by the claimant himself. On such hypothesis, they contend that the only competent medical evidence upon which a proper order of the Industrial Court could have been predicated was the report of their examining physician, Dr. Mc.

We do not agree. In Reints v. Diehl, Okl., 303 P.2d 641, this Court regarded, as competent evidence, medical opinions—as to the employees's death from myocardial infarction due to strain and exertion—based upon symptoms related by lay witnesses and considered by physicians who had never seen, or examined, the employee during his lifetime. And, in dealing with arguments similar to those advanced by the petitioners in this case, this court in Pete Doye Oil Field Service v. Lewis, Okl., 395 P.2d 401, in the course of holding "not incompetent" as to the involved employee's disability, a Dr. P's opinion that may have taken into consideration the diagnosis of a Dr. V, related to him by the employee and/or Dr. V, said:

"We find insufficient merit in petitioner's arguments to warrant vacation of claimant's award. Claimant's brief cites Sutherland Lumber Co. v. Roberts, 167 Okl. 646, 31 P.2d 581, wherein this court said:

'Medical testimony based on employee's statement at the time of the examination in compensation cases, though not made for the purpose of treatment, is competent.'

\* \* \* \* \* \*

\* \* \* in our view, whether Dr. P was told about Dr. V's diagnosis by the claimant, or by Dr. V himself, is immaterial under the circumstances of this case. \* \* \*"

In speaking of Dr. P's report, we there said:

" \* \* \* His report reflects that he made his own *independent examination* of the claimant, and this included X-ray pictures giving *independent evidence* of the claimant's previous operation and of a previously performed myelogram, \* \* \*". (Emphasis added).

In this connection, notice also Southern Construction Co. v. State Industrial Com'n, Okl., 335 P.2d 351 (2nd syll.) and cases cited and discussed in the annotation at 51 A.L.R.2d 1051, 1073ff.

Statements similar to those above quoted could correctly be made about the reports of Drs. P and B in this case. Here, the report of the petitioners' doctor, ambiguously denies that he found no evidence ("suggestive of") of myocardial infarction, and we think shows that his statement that "* * * there is no evidence of myocardial infarction" is qualified by (among other things) his indicated reluctance to give an unqualified diagnosis, unconfirmed by his desired study of the same evidence Dr. P appears to have considered in his study of the claimant-patient's case (i. e., the electrocardiograms, enzymes, and/or other clinical or laboratory findings previously made in the Holdenville hospital). It also appears from the last paragraph of Dr. Mc's quoted report that the same criticism might be leveled against his opinion, as to the relation, or lack of it, between claimant's work and his attack, that petitioners' counsel levels against those of the other two reporting doctors, i. e., that it is based, at least partially, upon information given him by someone else—the difference in claimant's doctors' opinions, and Dr. Mc's, being that the latter appears likely to reflect the "misconception" this court described in H. J. Jeffries Truck Line v. Grisham, Okl., 397 P.2d 637, 641.

None of the statements petitioner's brief quotes from the cases of Snow v. Kinta Stripping Co., Okl., 372 P.2d 34, Glaspey v. Dickerson, Okl., 350 P.2d 939, and Western Good Roads Service Co. v. Coombes, 185 Okl. 599, 95 P.2d 633, are applicable to this case. Here, it does not appear from Dr. P's and Dr. B's reports that, in formulating their opinions, either of these doctors assumed "a set of facts" contrary to those disclosed by the undisputed facts established by claimant's other evidence. On the other hand, the only facts described in their reports, that might be termed "assumptions", appear to be consistent, and in conformity with other evidence.

In accord with the foregoing, we are of the opinion that the award in this case is supported by ample, competent, medical evidence. Therefore, said award is hereby sustained.

JACKSON, C. J., and DAVISON, WILLIAMS, BERRY, HODGES, LAVENDER and McINERNEY, JJ., concur.